Bill L. KELLEY, Dwayne Henderson, and Marvin Blubaugh, on Behalf of Themselves and Others who are Similarly Situated, Plaintiffs,

v.

MID–AMERICA RACING STABLES, INC., an Oklahoma corporation, D. Wayne Lukas, Jeffrey W. Lukas, R. Mark Guerkink, John V. Hazleton, C. Michael Williams, and Arthur Anderson & Co., Defendants.

No. CIV–89–1362–A.

United States District Court, W.D. Oklahoma.

Feb. 13, 1990.

On Motion For Reconsideration March 22, 1990.

ORDER

ALLEY, District Judge.

Before the Court is plaintiffs' motion to certify this securities fraud lawsuit as a class action. The issues have been thoroughly briefed. After consideration of arguments of counsel and the relevant law, the Court denies class certification for the following reasons.

*Commonality/Predominance*

█ The parties have spent the greatest part of their briefs addressing whether the case involves issues of law and fact common to the proposed class (Fed.R.Civ.P. 23(a)(2)), and whether these common issues predominate over individual issues (Fed. R.Civ.P. 23(b)). Indeed, the Court has directed much of its attention to this area as well. Of the elements a plaintiff must prove in a securities fraud case, one is reliance on misrepresentations or omissions by defendant. Reliance may be demonstrated directly through individual reliance, or indirectly through what has come to be known as the fraud on the market theory. Here, the issue is whether plaintiffs relied on misrepresentations allegedly made by defendants regarding the use of money to be raised in an initial public offering (IPO) of stock. In depositions, all three plaintiffs admitted they neither read nor relied on the prospectus issued June 16, 1987 in making their decisions to purchase Mid–America stock. Henderson depo., p. 63–64, lines 25–2; p. 151, lines 9–11; Blubaugh depo., p. 76, lines 4–17; Kelley depo., p. 65, lines 4–14. Instead, plaintiffs relied on advice given by stockbrokers and a Mid–America stockholder. Mr. Henderson relied on statements made by his stockbroker, Skip Burkey, and the fact that Wayne Lukas, a nationally known figure in the horse industry, was associated with Mid–America. Henderson depo., p. 74, lines 10–21; p. 75, lines 1–7. Mr. Blubaugh also relied on Skip Burkey's recommendation and Wayne Lukas' involvement. Blubaugh depo., p. 28, lines 1–12. At the suggestion of George Cole, a stockbroker, Mr. Kelley contacted Bill LaReese who is a major stockholder in Mid–America. Kelly depo., p. 26, lines 16–23. After talking with Mr. LaReese and discussing the venture, Mr. Kelley decided to invest. Kelley depo., p. 32, lines 14–17.

It is undisputed that all three plaintiffs purchased their stock in the IPO, as alleged in ¶ 16 of the Complaint. However, there is some evidence that Blubaugh purchased 2,000 shares on September 13, 1987. Blubaugh's Response to Interrogatories, No. 1. However, Mr. Blubaugh does not remember a purchase subsequent to the IPO, although he stated he may have done so. Blubaugh depo., p. 60–61, lines 13–25 and 1–16.

Defendants assert that proof of reliance will so vary among the proposed plaintiff class that issues of individual reliance will overwhelm any common issues. Plaintiffs claim that issues of individual reliance are beside the point because plaintiffs proceed under a fraud on the market theory, and thus have no need to address individual reliance. Implicit in plaintiffs' position is an admission that, absent availability of the fraud on the market theory, individual reliance issues will be significant among the proposed plaintiff class and will overwhelm any common issues.

*The Fraud on the Market Theory*

Two varieties of this new theory have emerged. One involves fraud in the secondary market in transactions subsequent to the initial offering. The Supreme Court described the theory as "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available information regarding the company and its business.... Misleading statements will therefore defraud purchasers even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance or misrepresentations." *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988), quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986). Although the Supreme Court specifically did not pass on the general validity of the theory, it did so implicitly by applying the theory to the case at hand. *See, Basic*, 108 S.Ct. at 989.

Some form of fraud on the market has been adopted by every circuit considering it. *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 361 (5th Cir.1987). Nevertheless, the theory is not uncriticized, and commands vigorous and thoughtful opponents. *See, Basic*, 108 S.Ct. at 993 (White, J. and O'Connor, J. dissenting); *Ross v. Bank South, N.A.*, 885 F.2d 723, 732 (11th Cir. 1989) (Tjoflat, J., dissenting).

■ The second version of fraud on the market is more aptly described as fraud *to enter* the market, or fraud created the market. In this scenario, fraud is alleged in the issuance of the securities. There is no established market at the time of an initial offering, and so the theory has been modified to accommodate that different situation.

The Tenth Circuit adopted the second version, the fraud to enter the market theory, in *T.J. Raney & Sons, Inc. v. Fort, Cobb Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330 (10th Cir.1983), *cert. denied* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984). The Fifth Circuit was the first to adopt the fraud to enter the market theory in *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), and in *Raney* the Tenth Circuit "[found] the Fifth Circuit's reasoning in *Shores v. Sklar* to be persuasive." *Raney*, 717 F.2d at 1333.

Under *Shores*, a plaintiff must show that:

(1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers,

(2) plaintiff reasonably relied on the securities' availability on the market as an indication of their apparent genuineness, and

(3) as a result of the scheme to defraud, plaintiff suffered a loss.

*Shores*, 647 F.2d at 469–70 (footnote omitted).

■ The factual background of *Raney* involved bonds issued by an invalid Oklahoma public trust. In that context, when adopting *Shores*, the Tenth Circuit stated that:

[f]ederal and state regulation of new securities at a minimum should permit a purchaser to assume that the securities were lawfully issued. This holding does not imply in any way that the regulatory body considers the worth of the security or the veracity of the representations made in the offering circular nor does it 'establish a scheme of investors' insurance.' It merely extends the protection of Rule 10(b)–5 to those cases in which the securities were not qualified legally to be issued, and as the act states there was a scheme to defraud or act to defraud.

*Raney*, 717 F.2d at 1333. The Tenth Circuit has not had further opportunity to consider the fraud to enter the market theory in the context of an IPO or where there is not a well-developed market. Thus, this Court·construes *Raney* conservatively and believes that *Raney* limits application of the fraud to enter the market theory in an IPO to situations where the securities were unlawfully issued and not legally entitled to be on the market under any circumstances.[1]

 Turning to the case at bar, all plaintiffs have testified that they bought their units (consisting of 2 shares of stock and a warrant) during the IPO, and the Complaint also so alleges. Paragraph 65 of the Complaint contains language tracking the recent case law to bring this lawsuit under a fraud to enter the market theory, but more importantly, plaintiffs have failed to come forward with evidence that these securities were not lawfully is-

sued. Instead, plaintiffs' motion and briefs on the class certification issue do little more than reiterate the Complaint.[2]

At this stage, plaintiffs bear the strict burden of proof that the requirements of Fed.R.Civ.P. 23 are satisfied.[3] *Johnson v. Gross*, 125 F.R.D. 169 (W.D.Okla.1989). Plaintiffs have come forward with little or no evidence to support their allegations that the securities were unlawfully issued, to thus invoke *Raney* and dispense with the need to demonstrate individual reliance on the part of each proposed class member. Plaintiffs' opening brief submitted no new evidence, save biographical data on two counsel, but instead summarized the Complaint and offered string cites for propositions of law. Plaintiffs' reply brief adds only a bit more to the fraud to enter the market issue, and essentially repeats earlier allegations and arguments.

Without a threshold showing that there was some illegality in the process of issuing the securities, plaintiffs cannot demonstrate that *Raney* should apply. Therefore, individual issues of reliance are relevant, and will not be the same for all proposed class members. As demonstrated by just these three plaintiffs, two relied on their stockbroker, Skip Burkey, and one relied on Bill LaReese, a major stockholder in Mid–America. Further, plaintiff Blubaugh admitted that his investment strategy was speculation. Blubaugh depo., p. 110, lines 17–19. (Mr. Blubaugh is also the plaintiff mentioned in the briefs to have purchased on the secondary market, al-

---

1. Judge Tjoflat's dissent in *Ross*, 885 F.2d at 732, describes the inaccuracy and confusion created by looking at whether the securities in question were "marketable." A security might be unmarketable either because it was unlawfully issued, or because it was priced too high, or because it was a bad business deal. *Raney* does not address this question. However, because the *Raney* holding was based on facts involving unlawfully issued securities, the Court today limits application of *Raney* to similar fact patterns involving unlawfully issued securities.

2. In reading the Complaint, it is interesting to note that the majority of the allegations go to alleged oral and written misrepresentations by defendants, and to alleged defects in the prospectus. In fact, ¶ 66 of the Complaint alleges

that due to defendants' wrongful conduct, "plaintiffs and members of the class advanced monies *based upon the prospectus*." (emphasis supplied). Apparently, plaintiffs have "shotgunned" the Complaint to give themselves the benefit of the fraud to enter the market theory. Although there is nothing to prohibit such broad pleading, more than pleading is necessary to prove reliance through the fraud to enter the market theory and to certify a class action.

3. The ensuing discussions of plaintiffs' evidence are in reference to the necessary evidence plaintiffs must present to meet their strict burden of proof to certify a class under Rule 23. These discussions are not germane to subsequent proceedings in this case with respect to the merits of plaintiffs' claims.

though he does not remember any such purchase subsequent to the IPO. Blubaugh depo., p. 60–61, lines 13–25 and 1–16.) The variety of reliance fact patterns differs among just these three plaintiffs, and will surely differ even more widely throughout the proposed plaintiff class. Thus, not only is the reliance issue not common, but it could not be a predominate common issue under Rule 23(b)(3).

■ Now, even assuming that Mr. Blubaugh did purchase on the secondary market, there has been no evidence introduced of the "efficiency" of the secondary market on which he allegedly traded.[4] *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989) very recently considered what factors might be examined to determine a market's efficiency. Suggested were:

(1) Whether there existed an average weekly trading volume during the class period in excess of a certain number of shares;

(2) Whether a significant number of securities analysts followed and reported on the company's stock during the class period;

(3) Whether there existed numerous market makers and arbitrageurs who would ensure completion of the market mechanism;

(4) Whether the company was entitled to file an S–3 Registration Statement in connection with public offerings;

(5) Whether there was a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

*Cammer,* 711 F.Supp. at 1286–87.

None of these factors has been addressed by plaintiffs, even though Mr. Blubaugh is proposed to represent class members who purchased on the secondary market. Without some showing of the efficiency of the over-the-counter market on which Mid–America stock was allegedly traded, plaintiffs cannot make out a fraud on the market argument under *Basic.* They have failed to carry their burden of proof on this point, and as with the fraud to enter the market theory, issues of individual reliance will overwhelm other common issues, and common issues will not predominate.

*Adequacy of Representation*

Fed.R.Civ.P. 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the proposed class. Although adequacy is often determined based on the skill and experience of the proposed class's counsel, "named plaintiffs might not qualify as adequate class representatives because they do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987) (citations omitted).

■ Class certification has thus been properly denied when "the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick,* 827 F.2d at 727. The upshot of this requirement is that the class's attorney may not become a *de facto* plaintiff. Based on the plaintiffs' testimony in this case, the Court finds that these plaintiffs are inadequate representatives because of their almost total lack of familiarity with the facts of their case. Indeed, what the plaintiffs know appears to come entirely from their counsel.

Mr. Henderson has testified that he has no personal knowledge that Wayne Lukas,

---

**4.** The Supreme Court in *Basic* appeared to approve the elements established by the lower court to prove fraud on the market in a *non-IPO,* secondary market setting. These elements are that the plaintiff must allege and prove:

(1) that the defendant made public misrepresentations;

(2) that the misrepresentations were material;

(3) that the shares were traded on an efficient market;

(4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares, and

(5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed.

*Basic,* 108 S.Ct. at 992, n. 27.

Jeff Lukas, Mark Guerkink or Mike Williams "cheated" him. Henderson depo., p. 138, lines 11–19. Despite his lack of personal knowledge that he was cheated, he states no basis for his involvement in the lawsuit other than what has been told him by counsel. Henderson depo., p. 139, lines 6–10. The information Mr. Henderson believes that defendants concealed from him was given to him by counsel. Henderson depo., p. 156, lines 6–25; p. 157, lines 1–7. When Mr. Henderson was asked why he believed he had been cheated, his counsel directed him not to answer, based on attorney-client and work product privileges. Henderson depo., p. 164, lines 5–23. Neither could Mr. Henderson summarize his allegations against Arthur Anderson without looking at the Complaint. Henderson depo., p. 173, lines 13–25; p. 174, lines 1–15. Finally, Mr. Henderson stated that, other than what he has been told by his counsel, he does not know how he has been "cheated." Henderson depo., p. 175, lines 3–12.

Based on Mr. Henderson's lack of knowledge about the case other than what has come from counsel, one might wonder why he consulted an attorney at all. However, Mr. Henderson testified that his stockbroker, Skip Burkey, suggested that he (Henderson) contact Mr. William Federman (counsel for plaintiffs) because there was 'a little bit more to [Mid–America] than met the eye'." Henderson depo., p. 93, lines 2–9; p. 95, lines 11–25; p. 96, lines 1–13. Mr. Henderson never contemplated suing until he spoke with Skip Burkey, and after consulting Mr. Federman. Henderson depo., p. 158, lines 4–6 and 12–25; p. 159, lines 1–2.

The story is virtually identical for Mr. Blubaugh. He was also advised to contact Mr. Federman by the same broker, Skip Burkey. Blubaugh depo., p. 79, lines 8–25; p. 80, lines 1–20. Mr. Blubaugh has equally limited personal knowledge of the claims in the lawsuit, other than that given him by counsel. Blubaugh depo., p. 97, lines 16–25; p. 98, lines 1–25.

Like his two co-plaintiffs, Mr. Kelley appears to have no personal knowledge, other than that given him by counsel, of any wrongdoing or misrepresentations made by any defendant. Kelley depo., p. 86, lines 24–25; p. 87–88; p. 89, lines 1–11; p. 95, lines 13–23; p. 115, lines 17–21. Also like Mr. Henderson and Mr. Blubaugh, Mr. Kelley was referred to Mr. Federman by a stockbroker, George Cole. Kelley depo., p. 77, lines 1–3. Prior to the referral to Mr. Federman, Mr. Kelley had not considered suing. Kelley depo., p. 78, lines 11–15.

The Court has gone to such great length in citing the record to demonstrate what apparently is an almost total lack of personal knowledge of their claims on the plaintiffs' part. From all appearances, the plaintiffs have abdicated their role to their attorneys, who now have become the *de facto* plaintiffs. "If the representative displays a lack of credibility regarding the allegations being made, or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied. The inquiry into the knowledge of the representative is to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney; the named party must be an adequate representative in addition to having adequate counsel." 7A C. Wright, A. Miller, M.K. Kane, *Federal Practice and Procedure* § 1766 (1986). While there is no question that plaintiffs' counsel are competent, there is substantial question that plaintiffs themselves understand much more than that they were involved in a bad business deal. Adequacy of representation of the proposed class is a point on which plaintiffs bear the burden of proof, and they have failed to carry their burden.

*Pendent and Other Claims*

■ Plaintiffs have also included claims for state statutory and common law fraud, state securities violations, and common law breach of fiduciary duty. "While federal courts have the power to hear state claims which derive from a common nucleus of operative fact, it is also clear that the exercise of pendent jurisdiction is within the discretion of the trial court." *In re Storage Technology Corp. Securities Litiga-*

*tion,* 630 F.Supp. 1072, 1080 (D.Colo.1986). Fraud on the market, and fraud to enter the market, are theories of reliance not yet developed in state courts. "The Supreme Court has cautioned that 'needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law." *In re Bexar Co. Health Facility Dev. Corp. Securities Litigation,* 125 F.R.D. 625, 636 (E.D.Pa.1989). Thus, the court in *In re Bexar Co.* concluded that such novel theories as fraud on the market are more appropriately decided in state courts when used in state securities law claims.

Moreover, plaintiffs' claims of common law fraud will necessarily involve the element of individual reliance. Every member of the proposed class will have to demonstrate his or her reliance to recover under the common law theories. "Individual questions of state law regarding the elements of these various theories will certainly predominate." *In re Bexar Co.,* 125 F.R.D. at 636.

Finally, there will be questions as to when each member of the proposed plaintiff class became aware of the alleged fraud or wrongdoing of the defendants. Because this case involves several claims under various statutes of limitations, proof of compliance with the statute of limitations will vary from plaintiff to plaintiff on each cause of action.

*Summary*

Taken individually and collectively, the factors identified in this Order preclude class certification. First, this case arose in the context of an IPO, thus preventing use of the more common fraud on the market theory, and requiring demonstration of fraud to enter the market (illegally issued securities) to prevent plaintiffs from having to prove their individual reliance. Plaintiffs have not carried their burden under the fraud to enter the market theory, and therefore reliance issues will be peculiar to each plaintiff. Likewise, plaintiffs

have failed to present any evidence that Mid–America stock was traded on a efficient secondary market. Without more, the plaintiffs cannot carry their burden of demonstrating that fraud on the market should replace individual reliance in a secondary market situation.

Second, plaintiffs demonstrate an appalling lack of knowledge about their case, other than that they lost a lot of money. Given their level of knowledge, they are inadequate representatives.

Third, fraud to enter the market is not a developed theory in state securities law, and reliance is never presumed in common law fraud.

Fourth, based on the numerous statutes and common law claims, each member of the proposed class will have different defenses to the statutes of limitations.[5] The Court finds that this case is not appropriate for treatment as a class action, and plaintiffs' motion to certify is denied.

It is so ordered.

## ON MOTION FOR RECONSIDERATION

Plaintiffs have moved for reconsideration of the Court's Order of February 13, 1990 denying class certification, or in the alternative for the Court to certify for interlocutory appeal the class issue under 28 U.S.C. § 1292(b). Defendants have responded, and the Court now denies both of plaintiffs' motions for the following reasons.

First, plaintiffs make an argument that they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). This argument appears for the first time in plaintiffs' motion to reconsider. It was raised neither in the original motion nor the reply, and the Court will not treat this motion to reconsider as a new motion for class certification. Plaintiffs had the opportunity of an initial brief and a reply. Why they did not include *Ute* at that time is not the Court's concern, but the Court will not "re-open" the matter now, much as

---

**5.** Because the Court has reached its decision based on the factors discussed above, it need

not reach the other grounds proposed by plaintiffs.

an appellate court will not consider an argument not made at the trial level. Plaintiffs have had more than one shot at this issue, and the Court will not entertain continual new arguments and briefing.

Second, plaintiffs claim this Court has missed the mark on interpretation of *T.J. Raney & Sons, Inc. v. Ft. Cobb Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984), because the Court has construed *T.J. Raney* in a manner unfavorable to plaintiffs' position. The Court stands by its interpretation of *T.J. Raney* as limited to issuance of illegal securities, and is unpersuaded by plaintiffs' arguments to the contrary.

Third, plaintiffs claim the Court's reasoning that they are inadequate class representatives is erroneous. Plaintiffs present nothing to indicate the Court made an erroneous decision, but instead urge, in essence, that the Court could not possibly have meant what it said. Indeed, the Court did. Plaintiffs still know little, if anything, about their case other than that told them by their counsel. They claim this lack of knowledge does not matter because of the attorney-client privilege, but, as Arthur Anderson points out at p. 13–14 of its opposition brief, "[t]he fact that plaintiffs received all of their information from their attorneys is precisely the issue." No amount of case law or research can change this fact. The Court remains convinced that plaintiffs are virtually nominal parties, having abdicated their positions to their counsel who are now the *de facto* plaintiffs.

In the alternative, plaintiffs request the Court to certify an interlocutory appeal under 28 U.S.C. § 1292(b). Such an appeal will lie when there is a controlling question of law as to which there is substantial ground for difference of opinion, and when immediate appeal may materially advance the ultimate termination of the litigation. Plaintiffs argue that there is substantial ground for difference of opinion as to interpretation of *T.J. Raney.* The Court disagrees, but even if there were, plaintiffs are still inadequate class representatives.

The broadest reading of *T.J. Raney* will not change plaintiffs' knowledge, or lack thereof. Thus, regardless of Tenth Circuit pronouncement on *T.J. Raney,* independent grounds exist for denial of the class certification. Under these circumstances, interlocutory appeal could not advance termination of the litigation, but would only delay it.

Based on the foregoing reasons, plaintiffs' motion to reconsider and motion to certify interlocutory appeal are denied.