**Jerry KRIM, Plaintiff,**

v.

**PCORDER.COM, INC.; Ross A. Cooley; Trilogy Software, Inc.; Peter J. Barris; Joseph A. Liemandt; Robert W. Stearns; and Linwood A. Lacy, Jr., Defendants.**

**No. A–00–CA–776–SS.**

United States District Court, W.D. Texas, Austin Division.

Oct. 21, 2002.

---

J. Hoke Peacock, II, Orgain, Bell & Tucker, Beaumont, TX, Harvey Greenfield, Laura M. Perrone, Law Firm of Harvey Greenfield, New York City, Michael D. Braun, Stull, Stull & Brody, Los Angeles, CA, for Jerry Krim.

James D. Baskin, III, The Baskin Law Firm, Austin, TX, Andrew L. Barroway, Shiffrin & Barroway, Bal Cynwyd, PA, James I. Jaconette, William S. Lerach, Darren J. Robbins, Stephen J. Oddo, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Bruce G. Murphy, Law Offices of Bruce G. Murphy, Vero Beach, FL, Paul Geller, Jonathan M. Stein, Howard K. Coates, Jack Reise, Jr., Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, Ira M. Press, Kirby, McInerney & Squire, LLP, New York City, Richard Bemporad, Lowey, Dannenberg, Bemporad & Selinger, PC, White Plains, NY, Marian P. Rosner, Wolf Popper, LLP, New York City, for Jean Schwartz.

James Edward Maloney, Baker & Botts, Houston, TX, Patrick O. Keel, Baker Botts, LLP, Austin, TX, for pcOrder.com, Inc., Ross A. Cooley, James J. Luttenbacher, and Cristina C. Jones.

Robert M. O'Boyle, Haynes and Boone, Austin, TX, Noel M. Hensley, Nicholas Even, Haynes and Boone, LLP, Dallas, TX, for Peter J. Barris, Joseph A. Liemandt, and Trilogy Software, Inc.

Alan D. Albright, Geoffrey R. Unger, Gray, Cary, Ware & Freidenrich, LLP, Ausin, TX, Robert W. Brownlie, Shirli Fabri Weiss, Gray, Cary, Ware & Freidenrich, San Diego, CA, for Robert W. Stearns and Linwood A. Lacy, Jr., Karl S. Stern, Vinson & Elkins, Houston, TX, Gary Ewell, Vinson & Elkins, LLP, Austin, TX, for SG Cowen & Co., Credit Suisse First Boston, and Goldman, Sachs & Co.

1. This Court appointed Gene Burke, David Petrick, Michael Avurtin, and Yuen Michael Chau as Lead Plaintiffs in its order entered May 14, 2001. However, Avurtin filed his notice of withdrawal as lead plaintiff on August 26, 2002.

2. In their Motion for Class Certification, Lead Plaintiffs requested the appointment of Michael Avurtin, Yuen Michael Chau, and Lindeman Cap-

## ORDER

SPARKS, District Judge.

BE IT REMEMBERED on the 20th Day of September 2002, the Court called the above-styled cause for hearing on all pending matters, and the parties appeared through counsel of record. Before this Court are Plaintiffs' Motion to Certify the Class [# 133] and supporting memorandum [# 134], Defendants' response and appendix [# 136], Plaintiffs' reply [# 139], appendix [# 140]and clarification [# 147], and Plaintiffs' [# 153] and Defendants' [# 152] post-hearing submissions. Having considered the motion and responses, the arguments of counsel at the hearing, the case file as a whole, and the applicable law, the Court enters the following opinion and order.

### Factual Background

This lawsuit is a consolidated securities action grounded in strict liability and negligence against pcOrder.com, Inc., its directors, controlling shareholder Trilogy Software, Inc., and its investment bankers (collectively, the "Defendants") pursuant to Sections 11 and 15 of the Securities Act of 1933. The suit is brought by investors who purchased stock they allege was issued pursuant to misleading Registration Statements filed with the Securities and Exchange Commission ("SEC") in connection with pcOrder.com's March 1999 initial public offering and/or its December 1999 secondary public offering. The Lead Plaintiffs [1] move for this Court to appoint Gene Burke, David Petrick, and Bret Beebe [2] as class representatives and certify the following class:

> All persons who purchased or otherwise acquired the common stock of pcOrder.com, Inc. ("pcOrder" or the "Company") in connection with the Company's February 26, 1999 Initial Public Offering

ital Partners as class representatives as well. *See* Mot. for Class Cert., at 1. However, Lindeman Capital Partners filed its notice of withdrawal as proposed class representative on August 30, 2002. Avurtin has withdrawn as lead plaintiff and at the hearing, Counsel stated Chau was no longer before this Court as a proposed class representative. Tr. at 6.

("IPO"), issued pursuant to the Form S-1/A Registration Statement filed with the SEC on February 25, 1999, and the March 1, 1999 Prospectus, or the Company's December 7, 1999 Secondary Public Offering ("Secondary Offering"), issued pursuant to the Form S-1/A Registration Statement filed with the SEC on December 6, 1999, the Form S-1MEF filed with the SEC on December 7, 1999 and the December 8, 1999 Prospectus, and were injured thereby (the "Class"). Excluded from the Class are defendants and member of their immediate families, pcOrder's officers and directors, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any excluded party.

On February 26, 1999, pcOrder.com conducted an initial public offering, and on December 7, 1999, a secondary public offering. In conjunction with each, pcOrder.com filed a registration statement with the SEC. Lead Plaintiffs contend the February 1999 and December 1999 registration statements and prospectuses contained therein were false and misleading when filed with the SEC because they misrepresented pcOrder.com had a viable business plan, had an ability to generate and report accurate operating and financial information, and stated pcOrder.com was not competing with Trilogy Software for revenue. *See* Consolidated Class Action Compl., at 1. Lead Plaintiffs claim they and other members of the proposed class suffered tens of millions of dollars in damages as a result of their purchasing pcOrder.com stock issued pursuant to and traceable to misleading registration statements. *Id.* at 2 & 16.

## Analysis

Defendants argue this class should not be certified and Beebe, Petrick, and Burke should not be appointed as class representatives because: 1) Lead Plaintiffs do not have standing to sue under Section 11 of the Securities Act of 1933 and, even if they did, 2) the proposed class representatives and class counsel do not comply with the adequacy requirement for class certification.

## I. Section 11 Standing

■ Defendants argue Lead Plaintiffs do not have standing to pursue their cause of action under Section 11 of the Securities Act of 1933 because they did not actually purchase their shares in either the initial or secondary offering. Lead Plaintiffs argue they do have standing because all three, Beebe, Burke, and Petrick, purchased shares *traceable* to the initial and/or secondary offering. Recently, the question of exactly who has standing to sue pursuant to Section 11 has given rise to a contentious debate centering on the statute's language, legislative history, and the purpose of the Securities Act of 1933. *Compare* Paul C. Curnin & Christine M. Ford, *The Critical Issue of Standing Under Section 11 of the Securities Act of 1933*, 6 FORDHAM J. CORP. & FIN. L. 155 (2001) (arguing Section 11 standing is limited to purchasers in the actual initial distribution of securities) *with* Brian Murray, *Aftermarket Purchaser Standing Under § 11 of the Securities Act of 1933*, 73 ST. JOHN'S L. REV. 633 (1999) (maintaining aftermarket purchasers should be permitted to sue under Section 11).

Neither the Supreme Court nor the Fifth Circuit has explicitly defined the scope of Section 11 standing. However, the Supreme Court mandates "the starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Thus, this Court is guided by Section 11's language and several Circuits' interpretation of it. Section 11, in relevant part provides:

"In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to a state a material fact required to be stated therein or necessary to make statements therein not misleading, any person acquiring such security (unless it is proved that at the time of the acquisition he knew of such untruth or omission) may ... sue." 15 U.S.C. § 77k(a).

The federal courts of appeals pay particular attention to: "any person acquiring such security ... may sue." *See Lee v. Ernst & Young, L.L.P.*, 294 F.3d 969, 977 (8th Cir.

2002); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir.1999). This language suggests a much broader class of potential plaintiffs than those who literally purchased their shares in the challenged offering. *See Joseph*, 223 F.3d at 1159 and *Hertzberg*, 191 F.3d at 1080 (both interpreting this language to mean a purchaser must have purchased stock under the registration statement at issue, as opposed to another registration statement); *see also Lee* 294 F.3d at 976 (comparing the Section 11 language with the Section 12(2) language at issue in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 ("sells a security . . . to the person purchasing such security from him") and interpreting only the latter to have a strict privity requirement and thus a more limited standing standard).

The appellate courts also emphasize two other provisions of Section 11 which, if no aftermarket purchasers were permitted to sue, would be rendered meaningless or redundant. Section 11(a) includes an additional requirement for recovery for a person who acquired a security "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). Such a person must prove reliance on the registration statement. *Id.* This section must contemplate aftermarket purchasers, or else it would be limited in its applicability to the rare instances when an offering lasts more than twelve months. *Joseph*, 223 F.3d at 1159; *Lee*, 294 F.3d at 977. Additionally, Section 11(e) sets a baseline for damages: the difference in the amount for which the security is sold and the amount paid, not exceeded by the price at which it was offered to the public. 15 U.S.C. § 77k(e). If the only plaintiffs with standing are those who bought at the initial offering, every plaintiff would have purchased his security at the amount at which it was offered to the public, and this provision would make no sense. *Joseph*, 223 F.3d at 1159; *Lee*, 294 F.3d at 977; *Hertzberg*, 191 F.3d at 1080.

This Court is sufficiently persuaded by the analysis of the Eighth, Ninth, and Tenth Circuits, and notes the Fifth Circuit has anticipated potential aftermarket effects of misleading registration statements. *See Columbia General Inv. Corp. v. SEC*, 265 F.2d 559, 562 (5th Cir.1959) ("Persons other than those who purchase new stock under the Registration may be affected in point of fact and may, under certain circumstances, have remedies in point of law for misrepresentations in a Registration."). Accordingly, this Court concludes aftermarket purchasers who can trace their purchases to the misleading registration statement have standing to sue.

However, the more difficult issue remains: what must a plaintiff demonstrate to satisfy the requirement he "trace" his stock to the problematic registration statement? The courts of appeals have given little guidance on which *methods* of tracing are legally acceptable, but this Court derives some insight from the factual context of each opinion. In *Hertzberg*, the plaintiff purchased stock on the open market more than twenty five days after the registration statement was filed. *Hertzberg*, 191 F.3d at 1078. The Ninth Circuit held any person who purchased stock in the initial offering or thereafter has standing, so long as the stock purchased was issued under that registration statement. *Id.* at 1082. The Court reasoned because all the stock ever publicly issued by the defendant was sold in the single offering, the task of tracing the stock to that offering, admittedly difficult in some cases, was not a problem for plaintiff Hertzberg, and concluded his purchases were traceable to the sole offering. *Id.* In *Joseph*, the defendant sold $97 million worth of convertible debentures in a public offering, issued pursuant to a registration statement. *Joseph*, 223 F.3d at 1157. The plaintiff bought 150 debentures later that same year. *Id.* Employing the same rationale as the Ninth Circuit in *Hertzberg*, the Tenth Circuit reasoned "because [the defendant] made only one debenture offering, the debentures [the plaintiff] purchased are directly traceable to the May offering and registration statement." *Id.* at 1160.

In *Hertzberg* and *Joseph* the Ninth and Tenth Circuits seized on the fact the only available securities in the market were

those issued pursuant to the misleading registration statement, and therefore concluded the plaintiffs had satisfied the tracing requirement for their security purchases. In this case, according to the Lead Plaintiffs' testimony at the hearing, Mr. Beebe purchased stock at a time when only shares issued pursuant to the registration statement were available on the market, and therefore he has standing.[3] Beebe purchased one thousand shares on April 19, 1999, two months after the February 26, 1999 initial public offering. Tr. at 24. Lead Plaintiffs' expert testified as of June 3, 1999, insider shares entered the market. Tr. at 101–103. Consequently, when the other Lead Plaintiffs, Burke and Petrick, purchased their shares after June 2, 1999, they may have purchased shares not issued pursuant to the IPO registration statement. Tr. at 25–28. Therefore, Burke and Petrick still need to demonstrate the traceability of their purchases in order to have standing.

■ Lead Plaintiffs assert Burke and Petrick have standing because there is such a high statistical probability (greater than 90 percent at all times) the stock they purchased on the open market was issued pursuant to the initial or secondary offerings' registration statements. However, this Court rejects the notion Lead Plaintiffs can satisfy their tracing burden by showing they *probably* bought stock issued pursuant to the allegedly false registration statement. *See Kirkwood v. Taylor*, 590 F.Supp. 1375, 1380 (D.Minn.1984) (refusing to presume a pro rata portion of the shares plaintiffs purchased in the aftermarket were new shares). In *Lee v. Ernst & Young, LLP*, the Third Circuit remanded the case after holding plaintiffs who can trace have standing so the district court could ascertain whether the plaintiffs did in fact have standing. *Lee*, 294 F.3d at 978. However, in reaching this holding, the Third Circuit relied heavily on the district court opinion in *Kirkwood v. Taylor*,

which contains extensive analysis of the tracing method Lead Plaintiffs ask this Court to accept, and so this Court turns to that opinion for guidance. *Id.* at 974–978.

The methodology utilized by Lead Plaintiffs, demonstrating they purchased traceable shares with statistical probability, is what the *Kirkwood* court named the "fungible mass" method. *Kirkwood*, 590 F.Supp. at 1378. Prior to June 3, 1999, approximately 2.5 million shares of pcOrder.com stock were registered in a stock certificate in the name of Cede & Co., the nominee name of the Depository Trust Company. Tr. at 102. At that point 100% of the shares were IPO shares. Tr. 101–105. At the end of June, when Burke purchased one thousand shares, some company insiders had sold their shares and those shares constituted a portion of the stock certificate, but IPO shares still comprised 99.85% of the certificate. Tr. at 105. After the December 7, 1999 secondary offering, Burke bought more shares and Petrick made several stock purchases over the next few months. At the time these men purchased, Lead Plaintiffs' expert testified at the hearing the stock certificate was comprised of 49% secondary offering stock and 42% initial public offering stock. The remaining 9% of stock was not issued pursuant to either offering. Tr. at 106.

Essentially, the Lead Plaintiffs asks this Court to adopt the following logic: because only 9% of the stock was not issued pursuant to a misleading registration statement, 91% of the stock each Lead Plaintiff purchased must be stock issued pursuant to a registration statement. Therefore, they have traced their stock and they have standing. However, Lead Plaintiffs must demonstrate *all* stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement. *Kirkwood*, 590 F.Supp.

3. Beebe purchased his shares two months after the offering, and may have been influenced by the market as opposed to the registration statement, but granting him standing is consistent with the fact Section 11 does *not* require reliance. 15 U.S.C. § 77k. Section 11's imposition of strict liability gives companies the incentive to be accurate in the registration statements. *See*

*Lee*, 294 F.3d at 977. Note, however, the statute reasonably limits the period in which a purchaser need not demonstrate reliance to twelve months once earning statements have been released, so if there is just one offering, plaintiffs years down the road will have little success under Section 11 (although they might have remedies under other federal securities laws).

at 1378. Otherwise, "all persons who held stock in street name on and after the offering date could claim a proportional interest in the shares" and the "issuer could find itself liable for far more than the number of shares issued in the challenged offering." *Id.* at 1380. Because Lead Plaintiffs' allegations do not demonstrate Burke or Petrick can trace their purchases to either offering's allegedly misleading registration statement, Burke and Petrick have no standing to sue.

## II. Satisfaction of Rule 23(a)(4) Adequacy Requirements

Defendants next argue even if Lead Plaintiffs have standing to sue, the Court should not certify the class or appoint the them as class representatives because they fail to satisfy Rule 23's adequacy requirement. FED. R. CIV. P. 23(a)(4). This Court has concluded only Beebe has standing to sue, but it considers whether *any* of the proposed class representatives or the proposed class satisfy what Rule 23 requires:

> (1) the class be so numerous that joinder of all members is impracticable;
>
> (2) there be questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> FED. R. CIV. P. 23(a).

Lead Plaintiffs bear the burden of proving they satisfy the Rule 23 requirements. *See Castano v. Am. Tobacco*, 84 F.3d 734, 740 (5th Cir.1996). The Court is satisfied Lead Plaintiffs have demonstrated the numerosity of the class and the commonality of the claims. Defendants also argue the representatives do not satisfy the typicality requirement. While the typicality of the representatives is a closer issue, the Court notes Lead Plaintiffs are not held to a demanding standard, and instead proceeds to evaluate the dispositive question of adequacy. *Lightbourn v. El Paso*, 118 F.3d 421, 426 (5th Cir.1997).

■ A class representative or group of representatives may fall short of the Rule 23 adequacy requirement in three different ways: 1) representation by inadequate counsel, 2) conflict between the representative(s) and the class members, or 3) a lack of ability or willingness to take an active role in and control of the litigation to protect the interests of the absentee class members. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479–80 (5th Cir.2001); *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.1982). Defendants claim the proposed class representatives are inadequate because they have not demonstrated an ability to direct the litigation and they are represented by inadequate counsel.

### A. Inability of Proposed Class Representatives to Direct & Control the Litigation

The Fifth Circuit interprets the adequacy requirement to mandate an inquiry into " 'the willingness and ability of the representatives to take an active role in and control of the litigation and to protect the interests of the absentees.' " *Berger*, 257 F.3d at 482 (citing *Horton*, 690 F.2d at 484). Representatives should understand the action in which they are involved, and their "understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483 n. 18. The competency of class counsel is not enough on its own; [4] the representatives themselves must be familiar with the case. *Id.* Although the representatives themselves need not be legal scholars and may rely on their attorneys, they do need to "know more than 'they were involved in a bad business deal.' " *Id.* (quoting *Kelley v. Mid–America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D.Okla.1990)). An example of an adequate class representative is one with "commendable familiarity with the complaint and the concept of a class action." *Horton*, 690 F.2d at 484. The Court now considers each proposed representative in turn.

#### 1. David Petrick

Mr. Petrick has been involved in commercial real estate professionally for twenty-one

---

4. Additionally, the adequacy of counsel is at issue in this case, as discussed infra, Section II.B.

years. Tr. at 33. He has worked with attorneys before, but his only experience in a lawsuit was a landlord-tenant dispute. *Id.* Petrick testified if he was appointed class representative, he had obligations to keep up with the case and in contact with his attorneys, and he would have a fiduciary responsibility to the class members. Tr. at 34. However, he later testified in his entire time in his role as lead plaintiff (since January of 2000), he believed he was representing his own interests, not the class members'. Tr. 41–42, 44–45. Petrick even affirms he has no understanding of the role he is playing in this securities fraud lawsuit other than what his lawyers told him. Tr. at 42. At the hearing, Petrick demonstrated a general understanding of the nature of the suit,[5] although he still did not know it involved two allegedly misleading registration statements. Tr. at 35 & 45. Additionally, Petrick testified as of his deposition just one month prior to the hearing, he could not even name another lead plaintiff and he thought the suit was about the tender offer in which he sold his stock. Tr. at 36 & 53.

Petrick's lack of knowledge as of the date of the deposition strongly suggests he derived most, if not all, of his understanding of this case, his role in it, and the nature of a class action from his attorneys within the few weeks between the deposition and the hearing. Furthermore, he had very little involvement in the case, participating in one conference call since he had been appointed lead plaintiff and reviewing some court documents. Tr. at 37 & 46. He demonstrated no understanding of his obligations as lead plaintiff, even though he signed certifications filed with the Court. Tr. at 43–44. Petrick knew nothing of the other lawsuits his attorneys were pursuing against the Defendants, including whether he was a member of the classes in those suits, or that the suits involved settlement offers from the Defendants. Tr. 50–52. Essentially, all Petrick knew was pcOrder.com had conducted bad

business—not enough to satisfy the adequacy requirement. Therefore, even if Petrick had standing, this Court's concerns regarding Petrick's ability to direct and exercise control over the litigation would prevent his certification as a class representative.

### 2. Bret Beebe

■ Mr. Beebe owns and runs a manufacturing business with one hundred and forty employees. Tr. at 62. He worked for Compaq in the early 1980s and was involved in a lawsuit against Compaq over stock options vesting during a leave of absence. Tr. at 63. Although Beebe possesses more relevant experience than Petrick, he also gained the vast majority of his knowledge about this lawsuit and the nature of a class action from his attorneys, and primarily in the time period between the deposition and the hearing. Tr. at 71–72. As of his deposition one month before the hearing, Beebe had never met Mr. Baskin, one of his attorneys, and when asked to describe his role as lead plaintiff, he did not even mention the representation of other class members. Tr. at 91 & 96. Beebe testified he participated in conference calls about the case and received status letters and court documents. Tr. at 65 & 77. However, Beebe was unclear about whether he had participated in as few as two or as many as twenty conference calls, and if and when any other plaintiffs participated in the calls with him. Tr. 94–95. Beebe also testified he contributed nothing to the factual allegations in this lawsuit, and as of the time of his deposition, he did not know what was being alleged in this lawsuit as opposed to the pending lawsuit in state court. Tr. at 72. At the hearing, Beebe did not demonstrate a familiarity with the complaint, even though he swore in his January 11, 2001 declaration he reviewed the complaint and authorized its filing. Tr. at 83–86. Therefore, even though Beebe has standing to sue, this Court's concerns regarding Beebe's willingness and abil-

---

5. On direct examination, Petrick testified: "...it's my understanding that pcOrder lied on the registration agreement. They did not disclose that they did not have a business plan. They didn't have the operating controls to control budget and expenses. They didn't have the ability to report financial data on time. Their product was still under development and was faulty. And they also just didn't have the capability to deploy their product on time. I also feel that the lead man had a conflict of interests in that he was running pcOrder. And Ms. Jones and Mr. Cooley were just figure heads in the Company." Tr. at 35.

ity to direct and exercise control over the litigation prevent his certification as a class representative.

### 3. Gene Burke

Dr. Burke is an elderly gentleman battling illness, and was in fact too ill to make the trip to testify at the hearing or to conduct a deposition in this forum. Def.'s Opp. at 13. At his deposition, Burke needed breaks and to end early. App. to Def.'s Opp., Ex. 3 ("Burke Dep."), at 65:13—68:13. He testified at his deposition he cannot endure intense situations such as depositions for several hours in a row, and does not anticipate his health situation will significantly improve. Burke Dep. at 66:4—67:23. Burke does not presently engage in anything that requires several consecutive hours of intensity, and usually naps in the afternoon. Burke Dep. at 66:9–14 & 68:18–22. Burke reports he has endured five bypass surgeries and "8 million other things of various diseases," and he no longer possesses stamina. Burke Dep. at 66:9–21. Burke, due to his poor health, is unfortunately without the ability to take a sufficiently active and directing role in this litigation. A trial and all that leads up to it may require many intense hours from Dr. Burke, and his health has already prevented his participation in at least one key hearing. Therefore, this Court refuses to certify Burke as a class representative.

### B. Inadequacy of Counsel

■ Because of the binding effect on the class members, a district court must not only consider the adequacy of the representative class members, but also the quality and experience of class counsel. *See Berger*, 257 F.3d at 479; 7A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1769.1, at 374–375 (2d ed.1986); *see also Tedesco v. Mishkin*, 689 F.Supp. 1327, 1339 (S.D.N.Y.1988) (stating because "the unnamed members of the class are not present to protect their rights, the district court must accordingly take special care to guarantee the propriety and adequacy of the class' legal representation."). Counsel must be both zealous and competent in their representation to be adequate. *Ber-*

*ger*, 257 F.3d at 479. In undertaking an inquiry into adequacy, the Court considers the conflicts of interest of the class counsel, as well as the class representatives. Wright, *supra*, § 1769.1 at 384; *see also Chateau de Ville Productions, Inc. v. Tams–Witmark Music*, 474 F.Supp. 223, 226 (S.D.N.Y.1979) (counsel who seek to represent a class are "obliged to exercise their fiduciary obligations with particular care."). Conflicts of interest may exist for class counsel if they are involved in multiple lawsuits for the named representative or against the same defendants. Wright, *supra*, § 1769.1 at 384; *see also Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678–79 (N.D.Ohio 1995) (noting in these situations, the risk exists for potential class members that counsel will trade off certain of their interests to serve the interests of other clients). Class counsel must act with unwavering and complete loyalty to the class members they represent, and the "responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (citing *Sullivan v. Chase*, 79 F.R.D. 246, 258 (N.D.Cal.1978)).

■ Lead counsel in this suit are involved in multiple lawsuits against pcOrder.com in which they seek to represent different classes of pcOrder.com shareholders. In addition to this lawsuit, Milberg Weiss filed a federal securities action in New York arising out of the initial and secondary pcOrder.com stock offerings. *In re pcOrder.com, Inc., Initial Public Offering Sec. Litig.*, No. 01 Civ. 10828(SAS) (S.D.N.Y.) (the "New York Litigation"). Additionally, Milberg Weiss and the Baskin Law Firm seek to represent the shareholders in a class action in a Texas state court arising out of Trilogy Software, Inc.'s tender offer for pcOrder.com and the merger of Trilogy and pcOrder.com. *Martens v. pcOrder.com, Inc., et. al.*, No. GN003141 (District Court, Travis County, 353rd Judicial District). Finally, Defendants represent the shareholders in a case dismissed by this Court and currently on appeal to the Fifth Circuit. *Alcina v. pcOrder.com, Inc., et. al.*, No. 01–CV–0098–SS (W.D.Tex.). No class

has been certified in any of the lawsuits filed by these same lawyers.

Counsel argue there is no conflict in their representing the shareholders in these various cases.[6] However, the case law deems the *appearance* of conflict problematic, and actual and apparent conflict currently exist. Counsel did not timely disclose their participation in multiple class representations to their clients. In fact, at the time of his deposition just one month prior to the hearing, one proposed class representative did not even know his counsel was representing different proposed classes in different lawsuits. Tr. at 55. Furthermore, counsel participated in a full week of settlement negotiations with Defendants who offered to settle *all* lawsuits against pcOrder.com. Although unsuccessful, the negotiations demonstrate the problematic nature of counsel's multiple representations in negotiations. With multiple lawsuits, more than a fair chance exists that the shareholders represented in the various suits may be different but overlapping groups of people, and their interests may not always coincide. It could be in the New York class' best interest to settle, but not in this class' interest. At this point, the classes have not been certified and counsel do not even know who they represent in each action.

Additionally, the interests of the counsel may conflict with the members of one or more of the classes. The inability of counsel to discuss settlements offers in the other cases and the potential influence one case may have on a decision to settle the other are only part of the problem. Counsel are also limited in the information they can or will have the incentive to divulge because of their representation of different parties. Mr. Petrick did not even know he was a member of the class in the *Martens* case, or Milberg Weiss and Mr. Baskin represented the shareholders in that suit. Tr. at 55. It may be in Mr. Petrick's best interest to opt out of the *Martens* case, but coming to this decision, he would consult with counsel. However, because counsel also represent the class in the *Martens* case, they would not want Mr. Petrick to opt out and would likely discourage him from doing so.

Even counsel concedes there could be a conflict if there were competing judgments in these actions the Defendants could not satisfy, but argues because the chance of insolvency with these Defendants is slim and the Court plays a supervisory role over any settlement, the shareholders will be protected. Tr. at 30. The Court rejects the notion the Defendants' solvency erases potential conflict, and notes its supervisory jurisdiction over settlement is limited to this case alone. The Court will not be able to address unfair treatment of the class members of the New York Litigation in a settlement of this case, or unfair treatment of this proposed class' members in a New York settlement.

At the hearing, counsel presented a plan to the Court they believe ameliorates any conflict or appearance of conflict. Mr. Baskin and Milberg Weiss both offer to withdraw from representing the class in the *Martens* case, but Milberg Weiss will continue as lead counsel in the New York Litigation. Milberg Weiss would also withdraw as lead counsel in this case and Mr. Baskin would alone serve as lead counsel and make all decisions required of lead counsel. Tr. at 59. This proposal not only fails to erase all of this Court's concerns about potential conflicts, it clearly illustrates them and causes the Court to question the zeal with which counsel are looking after their clients' interests as opposed to their own. Counsel quickly dropped the class in the lower-dollar state action, but decided to stay involved in this and the New York Litigation, both potentially more lucrative. To date, counsel 1) failed to disclose their involvement in other lawsuits to their clients; 2) failed to disclose settlement offers and negotiations to their clients; and 3) failed to prepare their clients for their depositions, as demonstrated by the proposed class representatives' utter lack of knowledge about the lawsuit in their depositions. If counsel were truly concerned with their clients' interests, they would have offered to

---

6. Counsel also urge this Court to put off deciding this question until an actual conflict arises. The Court refuses to postpone consideration of this issue, because the fact this proposed class could conflict with the eventually certified class in the New York Litigation is relevant in considering the adequacy of representation in this case.

withdraw from all potentially conflicting representations, not just the ones with the least amount of money at stake.

## Conclusion

The Court finds the Lead Plaintiffs have not met the requirements for class certification. Dr. Burke and Mr. Petrick do not possess standing to bring this lawsuit pursuant to Section 11 of the Securities Act of 1933 because they cannot trace their stock purchases to the allegedly misleading registration statements filed with the SEC in conjunction with pcOrder.com's initial and secondary stock offerings. Mr. Beebe does have standing to sue because he can adequately trace his stock purchase. Regardless, even if all three had standing, Beebe, Burke, and Petrick have failed to demonstrate their own adequacy as class representatives and the adequacy of their counsel, and accordingly have not meet the Rule 23 standard for class certification.

In accordance with the foregoing:

IT IS ORDERED that Plaintiffs' Motion to Certify the Class [# 133] is DENIED.